## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JACQUELINE VORPAHL, PH.D., KAI VORPAHL, AND KATIE MCGUIRE, individually, and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. _____ |
| v. | |
| HARVARD PILGRIM HEALTH CARE, INC., HPHC INSURANCE COMPANY, INC. and POINT32HEALTH, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT – CLASS ACTION

Plaintiffs Jacqueline Vorpahl, Ph.D., Kai Vorpahl, and Katie McGuire (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action against Harvard Pilgrim Health Care, Inc., HPHC Insurance Company, Inc. and Point32Health, Inc. ("Point32") (collectively, "Harvard Pilgrim" or "Defendants"), by and through their attorneys, and allege, based upon personal knowledge as to their own actions, and based upon information and belief as to all other matters as permitted by Fed. R. Civ. Proc. 11, as follows:

## INTRODUCTION

1.     As detailed more fully below, on May 25, 2023, Harvard Pilgrim, one of the largest health insurers in the Northeast United States, announced that it began sending out letters advising over 2.5 million individuals of a ransomware data breach attack in April 2023 by a third-party hacker.

2.     This action arises from the negligent, reckless, or intentional failure by Defendants to adequately secure the private, personal medical information of Plaintiffs and all others similarly

situated who are either enrolled or previously enrolled in Defendants' health plans and who are to receive notice of that breach from Defendants.

3.    According    to    Harvard    Pilgrim's    data    breach    notice (https://www.harvardpilgrim.org/data-security-incident/), "[w]e determined that the files at issue may contain the following types of personal information and/or protected health information: names, physical addresses, phone numbers, dates of birth, health insurance account information, Social Security numbers, provider taxpayer identification numbers, and clinical information (e.g., medical history, diagnoses, treatment, dates of service, and provider names)."

4.    According to this notice, consumers may have been impacted if they are a current or former member of Harvard Pilgrim (including individual and family plans purchased directly from Harvard Pilgrim, state-based exchanges or plans selected through their employer) between March 28, 2012, and April 17, 2023 – a period of over 10 years – or if their physician or other provider is currently contracted with Harvard Pilgrim. Consumers may also have been impacted if they are current or were former members of certain Harvard Pilgrim health plans between June 1, 2020 and April 17, 2023 (collectively referred to herein as members of the "Class").

5.    Defendants abdicated their obligations and duties to protect sensitive personal information in their possession, as described in detail below, and failed to take steps necessary to prevent such an attack and have refused to date to fully and adequately notify victims of this attack that their personal information was improperly accessed and stolen as a result of such an attack and provide appropriate relief. Based on information available to Defendants, and in view of the known threat of attacks against health systems and healthcare providers, this was an entirely foreseeable event that could and should have been prevented, but, due to the negligent design of Defendants' networks, was not.

6.     For purposes of this Complaint, the term "Personal and Medical Information" encompasses and is referred to herein as including both Personal Health Information ("PHI"), and Personally Identifiable Information ("PII"), including Social Security numbers associated with individual health records within Defendants' computer systems as described in the breach letter referred to above.

7.     Since Personal and Medical Information encompasses such personal and revealing information, it is highly valued as a gateway to medical identity theft and general identity theft. Personal and Medical Information has been found to command up to $1,000 per individual record on the dark web. Organizations such as Defendants who are entrusted with this most sensitive and valuable data have a non-delegable and fiduciary duty to take particularly special care to maintain up-to-date information security practices and keep apprised of industry-related threats as they arise.

8.     The threat of such an attack was reasonably foreseeable to Defendants. Healthcare companies had been repeatedly warned of the potential for such an attack on their computer systems. Defendants also were aware, or should have been aware, of the many health system and healthcare provider data breaches that have occurred over the last decade. Yet, Defendants and their employees ignored these warnings and failed to implement reasonable and adequate security procedures for protection of these data.

9.     Companies that are the creators of or recipients of medical information, PII and PHI such as Defendants are legally required and have a non-delegable duty to keep their clients' Personal and Medical Information private and secured. Defendants breached duties owed to Plaintiffs and Class members by, *inter alia*, (i) not exercising reasonable care in retaining, maintaining, securing, and safeguarding current and former enrollee' nonpublic Personal and

Medical Information from being accessed and stolen by unauthorized persons; (ii) failing to implement processes to detect a breach or unauthorized access in a timely manner and to promptly act upon any warnings or alerts that Defendants' security systems had been breached or improperly accessed; (iii) failing to timely disclose the facts surrounding this breach to Plaintiffs and Class members; and (iv) failing to disclose that Defendants did not adequately secure Plaintiffs' or Class members' Personal and Medical Information.

10.     Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information at issue in order to protect Plaintiffs' and Class members' Personal and Medical Information.

11.     Defendants disregarded the rights of Plaintiffs and members of the Class by negligently, recklessly, and knowingly failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class members' Personal and Medical Information was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies, and procedures regarding data access and encryption, even for internal use, as well as appropriate procedures, such as two-step or multi-factor authentication, which would prevent such intrusions. As a result, the Personal and Medical Information of approximately 2.5 million Class members was compromised through disclosure to unauthorized third parties. This data includes enrollees' names, physical addresses, phone numbers, dates of birth, health insurance account information, Social Security numbers, provider taxpayer identification numbers, and clinical information (e.g., medical history, diagnoses, treatment, dates of service, and provider names), and other Personal and Medical Information.

12.    Plaintiffs and Class members now face a long-term battle against identity theft as a result of this breach. Plaintiffs and the Class members have a continuing interest in ensuring that this information is and remains safe. Stolen Personal and Medical Information can be used to interrupt important medical services. This presents an imminent and impending continuing risk for Plaintiffs and Class members, particularly where Defendants refuse to disclose any details of the cyber attack and what data were actually accessed and are available for third parties to exploit. Defendants' failure to adequately protect the nonpublic Personal and Medical Information in their possession has likely caused, and will continue to cause, substantial harm and injuries to Plaintiffs and Class members. Plaintiffs and the Class are thus entitled to injunctive and other equitable relief.

13.    Plaintiffs bring this action seeking damages, injunctive relief, and equitable relief that is appropriate for the benefit of Plaintiffs and the Class and the general public as appropriate for the particular causes of action at issue, including costs and expenses of litigation and attorneys' fees.

## PARTIES

### *Plaintiffs*

14.    Plaintiff Jacqueline Vorpahl, Ph.D. is a resident and citizen of Massachusetts, residing in Millis, Massachusetts. Dr. Vorpahl was a member of multiple Harvard Pilgrim health plans during the relevant time period.

15.    Plaintiff Kai Vorpahl is a resident and citizen of Massachusetts, residing in Millis, Massachusetts. Mr. Vorpahl was a member of multiple Harvard Pilgrim health plans during the relevant time period.

5

16.    Plaintiff Katie McGuire is a resident and citizen of Massachusetts, residing in Marshfield, Massachusetts.  Ms. McGuire was a member of a Harvard Pilgrim health plan during the relevant time period.

### *Defendants*

17.    Defendant Harvard Pilgrim Health Care, Inc. is a Massachusetts corporation, with its principal place of business at 1 Wellness Way, Canton, MA 02021.

18.    Defendant HPHC Insurance Company, Inc. is a Massachusetts corporation, with its principal place of business at 1 Wellness Way, Canton, MA 02021.

19.    Defendant, Point32Health, Inc. is a Massachusetts corporation, with its principal place of business at 1 Wellness Way, Canton, MA 02021. Point32Health, Inc. is the parent company of Harvard Pilgrim Health Care, Inc. and HPHC Insurance Company, Inc.

### JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one member of the Class is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

21.    This Court has personal jurisdiction over Defendants because Defendants are authorized to and regularly conduct business in Massachusetts, and are headquartered in this District.

22.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' and Class members' claims occurred in this District.

# FACTUAL ALLEGATIONS

**A.    Nature of the Data Breach**

23.    Defendants disclosed in a notice that was first made publicly available on or about May 25, 2023 and thereafter sent or to be sent to Plaintiffs and other affected Class members, that Defendants "discovered a cybersecurity ransomware incident that impacted systems that support Harvard Pilgrim Health Care Commercial and Medicare Advantage Strike plans" on April 17, 2023, and that "the investigation identified signs that data was copied and taken from our Harvard Pilgrim systems from March 28, 2023, to April 17, 2023." Attached hereto as Exhibit A is a true and correct copy of that Notice, and is incorporated herein by reference.  The incident referred to in that notice is referred to herein as the "Data Breach".  What is particularly strange about this notice is that a ransomware incident is typically brought to a company's attention promptly, by some entity demanding payment by a particular date or else it will publicly release the data; if they are paid they will provide keys to unlock the data.  If Defendants are to be believed, they received no notice of this exfiltration for at least three weeks, then waited over a month to address it. Thus, a critical piece of information is missing from this Notice - did Defendants "discover" this infiltration on their own, or did they 'discover' it only after receiving a ransomware demand?

24.    Defendants cannot dispute the data at issue was confidential Personal and Medical Information. The confidentiality of such information was breached as a result of Defendants' negligence as detailed herein. As set forth below, Defendants negligently maintained this confidential Personal and Medical Information and thereby allowed it to be accessed by unauthorized third persons by permitting such data to escape or spread from its normal place of storage within Defendants. Defendants thus negligently "released" and failed to preserve the

confidentiality of this Personal and Medical Information. In so doing, Plaintiffs and all Class members have a right to recover against Defendants under the laws set forth herein.

25.     In addition, not only did Defendants fail to provide a general description of the breach incident as required for purposes of statutory compliance, its vague and obfuscating language (for example, "the files at issue may contain") unfairly prevents those individuals who have been victimized in this attack from having sufficient information to take specific actions and mitigating measures that they might otherwise choose to if they were provided even the basic facts that this was an unauthorized attack and that the responsible organization stole over 2.5 million unique records of Plaintiffs' and Class members' Personal and Medical Information described above.

26.     These are significant omissions. For example, it would likely make a material difference to a consumer if his or her Personal and Medical Information was compromised by a group of teenagers, or researchers trying to alert Defendants that their security systems are deficient, as opposed to that sensitive data was stolen by a gang of cyber-thieves. Knowledge that the latter has occurred highlights the need to consider taking significant mitigation measures and scrutinize future financial and medical statements for evidence of identity theft. Plaintiffs and Class members have not received disclosure of these material facts.

**B.     Defendants Were On Notice Such a Data Breach Could Take Place**

27.     Defendants' negligence or reckless or knowing disregard of their obligations to safeguard the Personal and Medical Information of Plaintiffs and the Class members was exacerbated by the repeated warnings and alerts directed to protecting and securing such sensitive data, especially in light of the substantial increase in cyberattacks and data breaches in the healthcare and health insurance industries preceding the date of this attack.

8

28.     Specifically, as early as July 30, 2021, the U.S. Department of Health and Human Services ("HHS") issued an alert about potential threats to healthcare organizations from cyber attacks.[1] Referring to it as "nightmare," HHS recommended that healthcare organizations ensure they review the list of recommended mitigations in the Alert and promptly apply them to impacted systems in their infrastructure.[2]

29.     On August 25, 2021, the HHS Cybersecurity Program published another Alert entitled "Indicators of Compromise Associated with Hive Ransomware."[3] The Alert was also widely circulated and reported on by the media after its release.[4] HHS in particular noted that unauthorized parties had targeted entities in the healthcare and public health sector. The Alert, issued in conjunction with the FBI, described recommendations to detect, avoid, and recover from unauthorized party intrusions.[5] The Alert contains a list of specific, technical indicators to immediately advise companies such as Defendants that a system has been compromised, recognizing that awareness of these indicators could allow for detection during an attack and can help contain or minimize its impact.[6]

---

[1] *See*, HHS Cybersecurity Program H3: Section Alert (July 30, 2021), HiveNightmare/SeriousSAM Potential HPH Impact, https://www.hhs.gov/sites/default/files/sector-alert-hive-nightmare-serious-sam-tlpwhite.pdf (last accessed June 15, 2023).

[2] *Id.*

[3] HHS Cybersecurity Program HC3: Alert (August 25, 2021), https://www.hhs.gov/sites/default/files/iocs-associated-with-hive-ransomware-alert.pdf (last accessed June 15, 2023).

[4] *See, e.g.,* FBI Flash TLP White: Indicators of Compromise Associated with Hive Ransomware – August 25, 2021, American Hospital Association (8/25/21), https://www.aha.org/fbi-tlp-alert/2021-08-25-fbi-flash-tlp-white-indicators-compromise-associated-hive-ransomware (last accessed June 15, 2023).

[5] *See,* FBI Flash TLP:White dated August 25, 2021, https://www.ic3.gov/Media/News/2021/210825.pdf (last accessed June 15, 2023).

[6] HHS Cybersecurity Program HC3: Analyst Note (April 18, 2022), https://www.hhs.gov/sites/default/files/hive-ransomware-analyst-note-tlpwhite.pdf (last accessed June 15, 2023).

30.    The FBI Flash Alert also contained recommended mitigations that companies such as Defendants should immediately undertake:

- Back-up critical data offline.

- Ensure copies of critical data are in the cloud or on an external hard drive or storage device.

- Secure your back-ups and ensure data is not accessible for modification or deletion from the system where the data resides.

- Use two-factor authentication with strong passwords, including for remote access services.

- Monitor cyber threat reporting regarding the publication of compromised VPN login credentials and change passwords/settings if applicable. Keep computers, devices, and applications patched and up-to-date.

- Install and regularly update anti-virus or anti-malware software on all hosts.[7]

It appears based on the amount of time this attack went unnoticed that Defendants failed and refused to adopt all of these recommended mitigations. This is because according to Harvard Pilgrim, beginning on or about March 28, 2023, a hacker accessed and began to steal files from systems that support the Harvard Pilgrim Health Care Commercial and Medicare Advantage Stride℠ plans (HMO)/(HMO-POS) system. Harvard Pilgrim admitted this hacker was able to breach data by accessing files within their Health Care's servers, but did not detect this infiltration for almost three weeks: "Unfortunately, the investigation identified signs that data was copied and taken from our Harvard Pilgrim systems **from March 28, 2023, to April 17, 2023**." (emphasis added) Harvard Pilgrim claims some of its systems are still impacted months later, and that it is still investigating this incident and will provide updates if the investigation determines additional individuals may potentially be impacted.

---

[7] *Id.* at 7-8 (emphasis added), The August Alert also contains links to additional resources to prevent, protect and respond to ransomware events.

31.     As another HHS Analysis points out[8]:

When defending against Hive or any other ransomware variant, there are standard practices that should be followed. *Prevention is always the optimal approach*. This includes but is not limited to the following:

- Use two-factor authentication with strong passwords – this is especially applicable for remote access services such as RDP and VPNs.

- Sufficiently backing up data, especially the most critical, sensitive and operationally necessary data is very important. We recommend the 3-2-1 Rule for the most important data: Back this data up in three different locations, on at least two different forms of media, with one of them stored offline.

- Continuous monitoring is critical, and should be supported by a constant input of threat data (open source and possibly proprietary as well)

- An active vulnerability management program must be comprehensive in scope and timely in implementation of the latest software updates. It should apply to traditional information technology infrastructure as well as any medical devices or equipment that is network-connected.

- Endpoint security should be comprehensive in scope and updated with the latest signatures/updates aggressively.[9]

32.     Yet despite numerous attempts on the part of the federal government to inform

healthcare and insurance organizations, like Defendants, of the threat posed by such attacks, and

despite having over a year to prepare and prevent such an attack from such notices, Defendants

were negligent and did not implement steps to adequately prepare for this wholly foreseeable

event. It appears Defendants did not have multi-factor authentication in place with the requirement

of strong passwords; did not sufficiently arrange for back up data to be stored in a safe location

that could be quickly be brought back on line; did not engage in continuous system monitoring or

set up a system that would identify and prevent access from an increase of unauthorized account

access, did not acquire or implement an active vulnerability management program or

---

[8] HHS Cybersecurity Program HC3: Analyst Note, *supra*.
[9] *Id. (emphasis added)*.

comprehensive endpoint security measures that would have detected the fact hackers had access to Defendants' computer systems for three weeks without being detected.

33.    To date this unauthorized access, disclosure, and exfiltration remains fully unremedied and Harvard Pilgrim's systems are still adversely impacted. Defendants failed to provide notice to affected consumers in the most expedient time possible and without unreasonable delay, nor did it provide complete and accurate notice.

**C.    Defendants Violated Statutory and Regulatory Obligations To Protect Such Data**

34.    Defendants knew, or reasonably should have known, the importance of safeguarding the Personal and Medical Information entrusted to them and of the foreseeable consequences if their computer network was breached. Defendants were on notice that they should have and could have prevented this attack by properly securing and encrypting the Personal and Medical Information of Plaintiffs and the Class members and taking the steps outlined above to prevent infiltration by methods such as phishing by, for example, using multi-factor authentication methods. Defendants could also have destroyed data of certain former enrollees that was no longer useful, especially outdated data.

35.    Thus, Defendants failed to take appropriate preventive actions to protect Plaintiffs' and Class members' Personal and Medical Information or records against release consistent with their obligations under both the laws set forth herein and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. § 160.102, and all HIPAA Administrative Simplification Regulations in effect on January 1, 2012, contained in Parts 160, 162, and 164 of Title 45 of the Code of Federal Regulations, and Part 2 of Title 42 of the Code of Federal Regulations, including, but not limited to, the following: (a) Developing and implementing security policies and procedures; and (b) Encrypting the information or records, and protecting

12

against the release or use of the encryption key and passwords, or transmitting the information or records in a manner designed to provide equal or greater protections against improper disclosures.

36.     Indeed, similar cyberattacks have become so notorious that the FBI and U.S. Secret Service back in 2019 issued a warning to potential targets such as Defendants so they are aware of, and prepared for, a potential attack. And according to the cybersecurity firm Mimecast, 90% of healthcare organizations had experienced cyberattacks just in the year prior to the issuance of that report.[10]

37.     The healthcare industry in particular has experienced a large number of high-profile cyberattacks, placing Defendants on notice of the need to ensure their systems were not vulnerable to attacks such as suffered here. Cybersecurity breaches hit an all-time high in 2021, exposing a record amount of patient PHI. In 2021, 45 million individuals were affected by healthcare attacks, up from 34 million people in 2020.[11] Similarly, attacks against health plans jumped almost 35% from 2020 to 2021.[12]

38.     For example, Universal Health Services experienced a cyberattack on September 29, 2020. As a result, Universal Health Services suffered a four-week outage of its systems, which caused as much as $67 million in recovery costs and lost revenue.[13] Similarly, on or about May 1, 2021, Scripps Healthcare in San Diego suffered a cyberattack, an event that effectively shut down critical health care services for a month and left numerous patients unable to speak to physicians

---

[10] See, FBI, Secret Service Warn of Targeted Ransomware, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last accessed June 15, 2023)
[11] Critical Insight, *Health Breach Report July-Dec 2021* (2022), p. 3.
[12] *Id.* at 6.
[13] https://ir.uhsinc.com/news-releases/news-release-details/universal-health-services-inc-reports-2020-fourth-quarter-and (last accessed June 15, 2023).

or access vital medical and prescription records, just as happened here.[14] A couple of months later in July 2021, University of California San Diego Health suffered a similar attack.[15]

39.    Due to the high-profile nature of these breaches and attacks, Defendants either were or should have been on heightened notice and aware of such attacks occurring in the healthcare industry and, therefore, should have been on notice of their duty to be proactive in guarding against being subject to such attacks and adequately performed their duty of overseeing, preparing for, and immediately identifying such an attack. According to the cyber security organization Blackfog.com, by the time of this cyber attack Defendants should have been aware that ransomware attacks were on the upswing: "In 2022 we recorded a total of 376 attacks, a 29% increase over 2021 and 34% increase from 2020. Key take aways from these overall numbers is that 89% of all attacks now involve data exfiltration, 9% more than in 2021. From a tactical point of view we also saw an increase in the use of PowerShell, now at 87% of all attacks, a 7% increase from 2021. While the Dark Web was used in 23% of all attacks, a dramatic increase from 5% in 2021."[16]

40.    Yet, despite the prevalence of public announcements, Defendants failed to take appropriate steps to protect Plaintiffs' and Class members' Personal and Medical Information from being compromised and failed to timely, properly, and appropriately notify such persons that such an attack had taken place and the nature of the exfiltrated data.

---

[14] https://www.nbcsandiego.com/news/local/scripps-health-employees-regaining-access-to-internal-systems-hit-by-cyberattack-2/2619540/ (last accessed June 15, 2023).
[15] *Data Breach at UC San Diego Health: Some Employee Email Accounts Impacted* (July 27, 2021), https://www.nbcsandiego.com/news/local/data-breach-at-uc-san-diego-health-some-employee-email-accounts-impacted/2670302/ (last accessed June 15, 2023).
[16] https://www.blackfog.com/2022-ransomware-attack-report/ (last accessed June 15, 2023).

41.    In addition, as Defendants are entities covered by HIPAA, they are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C, which establish national security standards and duties for Defendants' protection of Personal and Medical Information maintained by them in electronic form.

42.    HIPAA requires Defendants to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

> "Electronic protected health information" is defined as "individually identifiable health information... that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

43.    HIPAA's Security Rule requires Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) ensure compliance by their workforce.

44.    HIPAA also requires Defendants to "review and modify the security measures implemented... as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and also to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

45.     The attack on Defendants, particularly in light of the information received by them over a year before the attack, establishes they did not comply with these Rules. This attack resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations, including, but not limited to, the following:

(a)     Failing to ensure the confidentiality and integrity of electronic PHI that Defendants create, receive, maintain, and transmit, in violation of 45 C.F.R. section 164.306(a)(1);

(b)     Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights such as by the use of multi factor authentication, in violation of 45 C.F.R. section 164.312(a)(1);

(c)     Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. section 164.308(a)(1);

(d)     Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. section 164.308(a)(6)(ii);

(e)     Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. section 164.306(a)(2);

(f)     Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. section 164.306(a)(3);

(g)     Failing to ensure compliance with HIPAA security standard rules by its workforce by providing for adequate comprehensive training rather than simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. section 164.306(a)(4);

(h)     Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. section 164.502, *et seq.*;

(i)     Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to

carry out their functions and to maintain security of PHI beyond simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

(j)    Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

46.    Defendants also violated the duties applicable to them under the Federal Trade Commission Act, 15 U.S.C. § 45 et seq. ("FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC pursuant to that Act and regulations promulgated thereunder has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

47.    The applicable FTC rules, regulations, and guidelines obligate businesses to protect PII and PHI from unauthorized access or disclosure by unauthorized persons.

48.    At all relevant times, Defendants were fully aware of its obligation to protect their enrollees' PII and PHI because they are sophisticated business entities that are in the business of maintaining and transmitting PII and PHI.

49.    Defendants were also aware of the significant consequences of their failure to protect PII and PHI for the millions of enrollees who provided their PII and PHI to Defendants, and knew that this data, if hacked, would injure Plaintiffs and Class members.

50.    Unfortunately, Defendants failed to comply with applicable FTC rules, regulations and guidelines, and industry standards concerning the protection and security of PII and PHI. As evidenced by the duration, scope, and nature of the Data Breach, among its many deficient practices, Defendants failed in, *inter alia*, the following respects:

a.    Developing and employing adequate intrusion detection systems;

b.    Engaging in regular reviews of audit logs and authentication records;

c.    Developing and maintaining adequate data security systems to reduce the risk of data breaches and cyberattacks;

d.    Ensuring the confidentiality and integrity of current and former subscribers' PII and PHI that Defendants receive and maintain;

e.    Protecting against any reasonably anticipated threats or hazards to the security or integrity of its current and former subscribers' PII and PHI;

f.    Implementing policies and procedures to prevent, detect, contain, and correct security violations;

g.    Developing adequate policies and procedures to regularly review records of system activity, such as audit logs, access reports, and security incident tracking reports;

h.    Implementing technical policies, procedures and safeguards for electronically stored information concerning PII and PHI that permit access for only those persons or programs that have specifically been granted access; and

i.    Other similar measures to protect the security and confidentiality of its current and former enrollees' PII and PHI.

51.    Had Defendants implemented the above-described data security protocols, policies, and/or procedures, the consequences of the Data Breach could have been avoided or greatly reduced. Defendants could have prevented or detected the Data Breach prior to the hackers accessing Defendants' systems and extracting sensitive and personal information for three weeks; the amount and/or types of PII and PHI accessed by the hackers could have been avoided or greatly reduced; and Plaintiffs and Class members would have been notified sooner, allowing them to promptly take protective and mitigating actions.

52.    As established by these laws, Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal and Medical Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants also owed a duty to Plaintiffs and Class members to provide reasonable security in compliance with industry standards and state

and federal requirements, and to ensure that their computer systems, networks, and protocols adequately protected this Personal and Medical Information and were not exposed to infiltration. This also included a duty to Plaintiffs and Class members to design, maintain, and test their computer systems to ensure that the Personal and Medical Information in their possession was adequately secured and protected; to create and implement reasonable data security practices and procedures to protect the Personal and Medical Information in their possession and avoid access to their systems through processes such as phishing, including adequately training employees and others who accessed information within their systems on how to adequately protect Personal and Medical Information; to avoid permitting such infiltration such as by use of multi-factor authentication; to implement processes that would detect a breach of their data security systems in a timely manner and to act upon data security warnings and alerts in a timely fashion; to promptly and fully disclose if their computer systems and data security practices were inadequate to safeguard individuals' Personal and Medical Information from theft or exfiltration; and to disclose in a timely and accurate manner when data breaches or cyber-attacks occurred.

53.     Defendants owed these duties to Plaintiffs and Class members because they were foreseeable and probable victims of any inadequate data security practices. Defendants affirmatively chose to design their systems with inadequate user authentication, security protocols and privileges, and set up faulty patching and updating protocols and backup systems. These affirmative decisions resulted in unauthorized parties being able to execute this attack and exfiltrate the data in question, to the injury and detriment of Plaintiffs and Class members. By taking affirmative acts inconsistent with these obligations that left Defendants' computer systems vulnerable to such an attack, Defendants disclosed and permitted the disclosure of Personal and Medical Information of Plaintiffs and Class members to unauthorized third parties. Through such

actions or inactions, Defendants failed to preserve the confidentiality of Personal and Medical Information they were duty-bound to protect.

54.     Defendants purport to care about data security and safeguarding subscribers' PII and PHI, and represent that they will keep secure and confidential the PII and PHI belonging to their current and former enrollees.

55.     Plaintiffs' and Class members' PII and PHI was provided to Defendants in reasonable understanding of their promises and self-imposed obligations to keep PII and PHI confidential, and to secure the PII and PHI from unauthorized access by malevolent actors. Defendants failed to do so.

56.     The length of the Data Breach, the period of time it went undetected and the years it impacts also demonstrates that Defendants failed to adequately safeguard PII and PHI by, *inter alia,* maintaining an adequate data security environment to reduce the risk of a data breach; periodically auditing their security systems to discover intrusions like the Data Breach; and retaining outside vendors to periodically test their network, servers, systems and workstations.

57.     Had Defendants undertaken the actions that federal and state law require, the Data Breach could have been prevented or the consequences of the Data Breach significantly reduced, as Defendants would have detected the Data Breach prior to the hackers extracting data from Defendants' networks, and Defendants' enrollees would have been notified of the Data Breach sooner, allowing them to take necessary protective or mitigating measures much earlier.

58.     Indeed, following the Data Breach, Defendants effectively conceded that their security practices were still inadequate and ineffective. In the FAQ for the Notice made publicly available, they admitted that two months after the breach several of their systems were still

impacted or offline: "System limitations impact coverage under Harvard Pilgrim Health Care Commercial and Medicare Advantage Stride℠ plans".

### D.     PLAINTIFFS AND THE CLASS SUFFERED HARM RESULTING FROM THE DATA BREACH

59.     Like any data hack, the Data Breach presents major problems for all affected.[17]

60.     As a direct and proximate result of Defendants' actions, inactions, omissions, breaches of duties and want of ordinary care that directly and proximately caused or resulted in this cyber-attack and the resulting data breach, Plaintiffs and Class members have suffered and will continue to suffer damages and other injury and harm in the form of, *inter alia*, (a) present, imminent, immediate, and continuing increased risk of identity theft, identity fraud, and medical fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation for the time and effort they are required to expend, (b) invasion of privacy, (c) breach of the confidentiality of their Personal and Medical Information, (d) deprivation of the value of their PHI, for which there is a well-established national and international market; (e) the financial and temporal cost of monitoring their credit reports and financial accounts and setting up or turning on fraud alerts, (f) Costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing or turning back on freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, (g) lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience,

---

[17] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers (last accessed June 15, 2023).

nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with federal and state law; (h) the imminent and impending injury and increased risk of future harm resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and (i) The loss of and impact on Plaintiffs' and Class members' privacy. Thus, as a direct and proximate result of Defendants' acts and omissions in failing to protect and secure Personal and Medical Information, Plaintiffs and Class members have been placed at a substantial risk of harm in the form of identity theft, and have incurred and will incur actual damages in an attempt to prevent identity theft.

## E. THE VALUE OF PERSONAL AND MEDICAL INFORMATION SHOWS THAT PLAINTIFFS AND OTHERS LOST VALUABLE MONEY OR PROPERTY AS A RESULT OF THIS ATTACK

61.    It is well known that Personal and Medical Information is a valuable commodity[18] and the frequent target of hackers, such that Plaintiffs and Class members would lose money or property if their data was permitted to be improperly accessed or stolen. The ramifications of Defendants' failure to properly secure Plaintiffs' and Class members' Private Information are thus material and potentially severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

62.    Defendants either were or should have been aware that the Personal and Medical Information they collect is highly sensitive and of significant value to those who would use it for wrongful purposes. As the FTC has reported, identity thieves can use this information to commit

---

[18] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

an array of crimes including identify theft, medical and financial fraud.[19] Medical identity theft is

one of the most common, most expensive, and most difficult-to-prevent forms of identity theft.

63.     Indeed, a robust cyber black market exists in which criminals post stolen Personal

and Medical Information on multiple underground Internet websites, commonly referred to as the

dark web, to create fake insurance claims, purchase and resell medical equipment, or access

prescriptions for illegal use or resale. Criminals often trade stolen Personal and Medical

Information on the "cyber black market" for years following a breach. For example, it is believed

that certain Personal and Medical Information compromised in the 2017 Experian data breach was

being used three years later by identity thieves to apply for COVID-19-related benefits.[20]

According to a 2017 Javelin strategy and research presentation, fraudulent activities based on data

stolen in data breaches that is between two and six years old had increased by nearly 400% over

the previous 4 years.[21]

64.     According to Experian, one of the three major credit bureaus, medical records can

be worth up to $1,000 per person on the dark web, depending upon completeness.[22] PII and PHI

can be sold at a price ranging from approximately $20 to $300.[23]

65.     Medical identify theft can also result in inaccuracies in medical records and costly

false claims. It can also have life-threatening consequences since if a victim's health information

---

[19]   Federal Trade Commission, What To Know About Identity Theft, https://consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed June 15, 2023).

[20]   Janelle Stecklein, *Director: 64,000-plus fraudulent unemployment claims 'mitigated'*, The Duncan Banner (June 24, 2020), https://www.duncanbanner.com/news/director-64-000-plus-fraudulent-unemployment-claims-mitigated/article_dc446671-73a6-5e8a-b732-bcedba72b458.html (last accessed June 15, 2023).

[21] *See,* Brian Stack, *Here's How Much Your Personal Information is Selling for on the Dark Web* (2017)                 https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed June 15, 2023).

[22] *Id.*

[23] https://www.privacyaffairs.com/dark-web-price-index-2021/ (last accessed June 15, 2023)

is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[24]

66.    The Ponemon Institute found that medical identity theft can cost victims an average of $13,500 to resolve per incident and that victims often have to pay off the imposter's medical bills to resolve the breach.[25]

67.    In another study by the Ponemon Institute in 2015, 31% of medical identity theft victims lost their healthcare coverage as a result of the incident, while 29% had to pay to restore their health coverage, and over half were unable to resolve the identity theft at all.[26]

68.    Once Personal and Medical Information is stolen, particularly such as membership identification numbers or Social Security numbers, fraudulent use of that information and damage to victims may continue for years, as the fraudulent use of such data resulting from the attack may not come to light for years. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity

---

[24] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, (2/7/14), https://khn.org/news/rise-of-indentity-theft/ (last accessed 5/3/22); *See also*, *Medical Identity Theft in the New Age of Virtual Healthcare*, IDX (March 15, 2021), https://www.idx.us/knowledge-center/medical-identity-theft-in-the-new-age-of-virtual-healthcare (last accessed June 15, 2023).
[25] Brian O'Connor, Healthcare Data Breach: What to Know About Them and What to Do After One, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed June 15, 2023).
[26] Ponemon Institute, *Fifth Annual Study on Medical Identity Theft*, (February, 2015), http://www.medidfraud.org/wp-content/uploads/2015/02/2014_Medical_ID_Theft_Study1.pdf (last accessed June 15, 2023).

theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[27] The ramifications of Defendants' failure to keep the Medical Information and Personal Information in question secure from attack and then not advise affected persons of all the relevant facts is thus not temporary but long lasting, as the fraudulent use of that information and damage to victims may continue for years. That is one of the reasons providing prompt, accurate and fulsome notice to consumers as expeditiously as possible is necessary, so they can take actions to protect themselves. Yet Defendants are still refusing to provide timely, proper, and appropriately comprehensive notice in the most expedient time possible and without unreasonable delay, as required under federal and state law.

69.     The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[28]

70.     According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.

---

[27] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm (last accessed June 15, 2023).
[28]*Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last accessed last accessed June 15, 2023).

71.     Furthermore, PII and PHI have a long shelf-life because they contain different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

72.     Accordingly, Defendants' wrongful actions and/or inactions and the resulting Data Breach have also placed Plaintiffs and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.[29] Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."[30] Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[31] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Personal and Medical Information will do so at a later date or re-sell it.

73.     In response to the Data Breach, Harvard Pilgrim has established a dedicated call center for individuals to contact with questions or concerns and for potentially impacted individuals to enroll in complimentary credit monitoring and identity theft protection services. However, as there is no description provided as to what they are actually providing, this is inadequate to protect against the lifelong risk of harm imposed on Plaintiffs and Class members by Defendants' failures and to protect them from the injuries resulting from the unauthorized access and exfiltration of their sensitive Personal and Medical Information.

---

[29] *Data Breach Victims More Likely To Suffer Identity Fraud*, INSURANCE INFORMATION INSTITUTE BLOG (February 23, 2012), available at http://www.iii.org/insuranceindustryblog/?p=267 (last accessed June 15, 2023).
[30] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), available at http://www.creditcards.com/credit-card-news/data-breach-id-theft-risk-increase-study-1282.php (last accessed June 15, 2023).
[31] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH- IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS.

74.    Plaintiffs and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Personal and Medical Information being accessed by cybercriminals, risks that will not abate within a mere one to two years: the unauthorized access of Plaintiffs' and Class members' Personal and Medical Information, especially their Social Security numbers, puts Plaintiffs and the Class at risk of identity theft indefinitely, and well beyond the limited period of credit monitoring that Defendants have indicated they will offer victims of the Data Breach.

75.    Plaintiffs retain an interest in ensuring there are no future data breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Personal and Medical Information was accessed in the Data Breach.

76.    Defendants have still not given full notice of the Data Breach to members of the Class, even though they were required to do so months ago and admit that for many Class members they may not give them direct notice at all. According to Defendants' webpage that supposedly provides notice of this breach:

> "While these investigations often take time to fully complete and sometimes only reveal limited additional information, the investigation is progressing and by June 15, 2023, we anticipate that we will begin the process of mailing written notifications to all potentially impacted individuals, such as current and former health plan subscribers and dependents including former members of employer groups no longer active with Harvard Pilgrim, dating back to March 28, 2012, for whom we have up to date contact information. Those individuals for whom we do not have up to date contact information have been notified through the previously mentioned notice on our public website consistent with the substitute notice requirement set forth in the Health Insurance Portability and Accountability Act (HIPAA) Breach Notification Rule."

Plaintiffs dispute the cited Rule permits substitute notice when Defendants will have addresses of all members of the Class but simply does not want to update them.

## CLASS ALLEGATIONS

77.     Plaintiffs bring this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class as defined in Paragraph 4 above.

78.     Excluded from the Class are Defendants, their executives and officers, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

79.     In the alternative, Plaintiffs bring this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a subclass of:

> All persons who are residents of the State of Massachusetts whose PII and PHI was accessed in the Data Breach (the "Massachusetts Subclass").

Excluded from the Massachusetts Subclass are Defendants, their executives and officers, and the Judge(s) assigned to this case.

80.     Numerosity: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, reports are that over 2.5 million individuals comprise the Class and were affected by the Data Breach. The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

81.     Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

> a.     Whether Defendants' data security and retention policies were unreasonable;

b.  Whether Defendants failed to protect the confidential and highly sensitive information with which they were entrusted;

c.  Whether Defendants owed a duty to Plaintiffs and Class members to safeguard their PII and PHI;

d.  Whether Defendants breached any legal duties in connection with the Data Breach;

e.  Whether Defendants' conduct was intentional, reckless, willful or negligent;

f.  Whether an implied contract was created concerning the security of Plaintiffs' and Class members' PII and PHI;

g.  Whether Defendants breached that implied contract by failing to protect and keep secure Plaintiffs' and Class members' PII and PHI and/or failing to timely and adequately notify Plaintiffs and Class members of the Data Breach;

h.  Whether Plaintiffs and Class members suffered damages as a result of Defendants' conduct; and

i.  Whether Plaintiffs and the Class are entitled to monetary damages, injunctive relief and/or other remedies and, if so, the nature of any such relief.

82.  <u>Typicality</u>: All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all members of the Class had their Personal and Medical Information compromised in the Data Breach. Plaintiffs and the members of the Class sustained damages as a result of Defendants' uniform wrongful conduct.

83.  <u>Adequacy</u>: Plaintiffs are adequate representatives because their interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that are materially antagonistic to the interests of other members of the Class.

84.    <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendants' records and databases.

85.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I -- Negligence
**(By Plaintiffs on behalf of the Class, or, in the alternative, the Massachusetts Subclass)**

86.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

87.    This count is brought on behalf of all Class members.

88.    Defendants owed a duty to Plaintiffs and the Class to use and exercise reasonable and due care in obtaining, retaining, and securing the Personal and Medical Information that Defendants collected.

89.    Defendants owed a duty to Plaintiffs and the Class to provide security, consistent with industry standards and requirements, and to ensure that its cyber networks and systems, and

the personnel responsible for them, adequately protected the Personal and Medical Information that Defendants collected.

90.    Defendants owed a duty to Plaintiffs and the Class to implement processes to quickly detect a data breach, to timely act on warnings about data breaches, and to inform the victims of the Data Breach as soon as possible after it is discovered.

91.    Defendants owed a duty of care to Plaintiffs and the Class because they were a foreseeable and probable victim of any inadequate data security practices.

92.    Defendants solicited, gathered, and stored the Personal and Medical Information belonging to Plaintiffs and the Class.

93.    Defendants knew or should have known they inadequately safeguarded this information.

94.    Defendants knew that a breach of its systems would inflict millions of dollars of damages upon Plaintiffs and Class members, and Defendants were therefore charged with a duty to adequately protect this critically sensitive information.

95.    Defendants had a special relationship with Plaintiffs and Class members. Plaintiffs' and Class members' highly sensitive Personal and Medical Information was entrusted to Defendants on the understanding that adequate security precautions would be taken to protect their Personal and Medical Information. Moreover, only Defendants had the ability to protect their systems and the Personal and Medical Information stored on them from attack.

96.    Defendants' own conduct also created a foreseeable risk of harm to Plaintiffs, Class members, and their Personal and Medical Information. Defendants' misconduct included failing to: (1) secure their systems, servers and networks, despite knowing their vulnerabilities, (2) comply with industry standard security practices, (3) implement adequate system and event monitoring,

and (4) implement the safeguards, policies, and procedures necessary to prevent this type of data breach.

97.    Defendants breached their duties to Plaintiffs and Class members by failing to provide fair, reasonable, or adequate cyber networks and data security practices to safeguard the Personal and Medical Information belonging to Plaintiffs and the Class.

98.    Defendants breached their duties to Plaintiffs and the Class by creating a foreseeable risk of harm through the misconduct described above.

99.    Defendants breached the duties they owed to Plaintiffs and Class members by failing to implement proper technical systems or security practices that could have prevented the unauthorized access of Personal and Medical Information.

100.    The law further imposes an affirmative duty on Defendants to timely disclose the unauthorized access and theft of the Personal and Medical Information belonging to Plaintiffs and the Class so that Plaintiffs and the Class can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Personal and Medical Information .

101.    Defendants breached the duties they owed to Plaintiffs and the Class by failing to disclose timely and accurately to Plaintiffs and Class members that their Personal and Medical Information  had been improperly acquired or accessed.

102.    Defendants breached their duty to timely notify Plaintiffs and Class members of the Data Breach by failing to provide direct notice to Plaintiffs and the Class concerning the Data Breach until on or after June 15, 2023.

103.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered a drastically increased risk of identity theft, relative to both the time period before

the breach, as well as to the risk born by the general public, as well as other damages, including but not limited to time and expenses incurred in mitigating the effects of the Data Breach.

104.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT II –- Negligence *Per Se*
### (By Plaintiffs on behalf of the Class, or, in the alternative, the Massachusetts Subclass)

105.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

106.    This count is brought on behalf of all Class members.

107.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair... practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendants, of failing to use reasonable measures to protect Personal and Medical Information. Various FTC publications and HIPAA laws and regulations also form the basis of Defendants' duty.

108.    Under Massachusetts Security Breach Law ("MSBL"), Mass. Gen. Laws Ann. Ch. 93H § 3(a), et seq., entities that maintain Personal and Medical Information must provide notice of a security breach "as soon as practicable and without unreasonable delay...."

109.    Furthermore, the Massachusetts Consumer Protection Act ("MCPA"), Ma. Gen. Laws Ann. Ch. 93A § 2(a), *et seq.*, prohibits, *inter alia*, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

110.    In addition to the FTC and HIPAA rules and regulations, the MSBL, and the MCPA, other states and jurisdictions where victims of the Data Breach are located require that Defendants protect Personal and Medical Information from unauthorized access and disclosure, and timely notify the victim of a data breach.

111.    Defendants violated the MSBL, the MCPA, and FTC and HIPAA rules and regulations obligating companies to use reasonable measures to protect Personal and Medical Information by failing to comply with applicable industry standards, and by unduly delaying reasonable notice of the actual breach. Defendants' conduct was particularly unreasonable given the nature and amount of Personal and Medical Information they obtained and stored, the foreseeable consequences of a Data Breach and the exposure of Plaintiffs' and Class members' sensitive Personal and Medical Information.

112.    Defendants' violations of the MSBL, the MCPA, and HIPAA and FTC rules and other applicable statutes, rules, and regulations constitutes negligence per se.

113.    Plaintiffs and the Class are within the category of persons the MSBL, the MCPA, HIPAA and the FTC Act were intended to protect.

114.    The harm that occurred as a result of the Data Breach described herein is the type of harm the MSBL, the MCPA, HIPAA and the FTC Act were intended to guard against.

115.    As a direct and proximate result of Defendants' negligence per se, Plaintiffs and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their Personal and Medical Information in Defendants' possession, and are entitled to damages in an amount to be proven at trial.

## COUNT III –- Breach of Implied Contract
**(By Plaintiffs on behalf of the Class, or, in the alternative, the Massachusetts Subclass)**

116.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

117.    This count is brought on behalf of all Class members.

118.    Plaintiffs and the Class provided Defendant with their Personal and Medical Information .

119.    By providing their Personal and Medical Information , and upon Defendants' acceptance of such information, Plaintiffs and the Class, on one hand, and Defendants, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contract that may be applicable.

120.    The implied contracts between Defendants and Plaintiffs and Class members obligated Defendants to take reasonable steps to secure, protect, safeguard, and keep confidential Plaintiffs' and Class members' Personal and Medical Information. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above. Defendants expressly adopted and assented to these terms in its public statements, representations and promises.

121.    The implied contracts for data security also obligated Defendants to provide Plaintiffs and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their Personal and Medical Information.

122.    Defendants breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the Personal and Medical Information belonging to Plaintiffs and Class members; allowing unauthorized persons to access Plaintiffs' and Class members' Personal and Medical Information ; and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiffs and Class members, as alleged above.

123.    As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiffs and the Class have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of their Personal and Medical Information in Defendants' possession, and are entitled to damages in an amount to be proven at trial.

## COUNT IV --- Bailment
### (By Plaintiffs on behalf of the Class, or, in the alternative, the Massachusetts Subclass)

124.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

125.    This count is brought on behalf of all Class members.

126.    Plaintiffs' and Class members' Personal and Medical Information was provided to Defendants.

127.    In delivering their Personal and Medical Information, Plaintiffs and Class members intended and understood that their Personal and Medical Information would be adequately safeguarded and protected.

128.    Defendants accepted Plaintiffs' and Class members' Personal and Medical Information.

129.    By accepting possession of Plaintiffs' and Class members' Personal and Medical Information, Defendants understood and accepted that Plaintiffs and the Class expected their Personal and Medical Information to be adequately safeguarded and protected. Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties.

130.    During the bailment (or deposit), Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care, diligence, and prudence in protecting their Personal and Medical Information .

131.    Defendants breached their duty of care by failing to take appropriate measures to safeguard and protect Plaintiffs' and Class members' Personal and Medical Information, resulting in the unlawful and unauthorized access to and misuse of Plaintiffs' and Class members' Personal and Medical Information.

132.     Defendants further breached their duty to safeguard Plaintiffs' and Class members' Personal and Medical Information by failing to timely notify them that their Personal and Medical Information had been compromised as a result of the Data Breach.

133.     Defendants failed to return, purge, or delete the Personal and Medical Information belonging to Plaintiffs and Class members at the conclusion of the bailment (or deposit) and within the time limits allowed by law.

134.     As a direct and proximate result of Defendants' breach of their duties, Plaintiffs and the Class suffered consequential damages that were reasonably foreseeable to Defendants, including but not limited to the damages set forth herein.

135.     As a direct and proximate result of Defendants' breach of their duty, Plaintiffs' and Class members' Personal and Medical Information that was entrusted to Defendants during the bailment (or deposit) was damaged and its value diminished.

### COUNT V –- Violation of State Data Breach Statutes
### (By Plaintiffs on behalf of the Class)

136.     Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

137.     This count is brought on behalf of all Class members.

138.     Defendants are corporations that own, maintain, and record Personal and Medical Information , and computerized data including Personal and Medical Information , about its current and former enrollees, including Plaintiffs and Class members.

139.     Defendants are in possession of Personal and Medical Information  belonging to Plaintiffs and Class members and is responsible for reasonably safeguarding that Personal and Medical Information consistent with the requirements of the applicable laws pertaining hereto.

140.    Defendants failed to safeguard, maintain, and dispose of, as required, the Personal and Medical Information within their possession, custody, or control as discussed herein, which they were required to do by all applicable State laws.

141.    Defendants, knowing and/or reasonably believing that Plaintiffs' and Class members' Personal and Medical Information was acquired by unauthorized persons during the Data Breach, failed to provide reasonable and timely notice of the Data Breach to Plaintiffs and Class members as required by numerous data breach statutes.

142.    Defendants' failure to provide timely and accurate notice of the Data Breach violated the following state data breach statutes:

a.    Alaska Stat. Ann. § 45.48.010(a), *et seq.*;

b.    Ark. Code Ann. § 4-110-105(a), *et seq.*;

c.    Cal. Civ. Code § 56, *et seq.*;

d.    Colo. Rev. Stat. Ann § 6-1-716(2), *et seq.*;

e.    Conn. Gen. Stat. Ann. § 36a-701b(b), *et seq.*;

f.    Del. Code Ann. Tit. 6 § 12B-102(a), *et seq.*;

g.    D.C. Code § 28-3852(a), *et seq.*;

h.    Fla. Stat. Ann. § 501.171(4), *et seq.*;

i.    Ga. Code Ann. § 10-1-912(a), *et seq.*;

j.    Haw. Rev. Stat. § 487N-2(a), *et seq.*;

k.    Idaho Code Ann. § 28-51-105(1), *et seq.*;

l.    Illinois Statute 815 ILCS 530/1, *et seq.*;

m.    Iowa Code Ann. § 715C.2(1), *et seq.*;

n.    Kan. Stat. Ann. § 50-7a02(a), *et seq.*;

o.      Ky. Rev. Stat. Ann. § 365.732(2), *et seq.*;

p.      La. Rev. Stat. Ann. § 51:3074(A), *et seq.*;

q.      Md. Code Ann., Commercial Law § 14-3504(b), *et seq.*;

r.      Mass. Gen. Laws Ann. Ch. 93H § 3(a), *et seq.*;

s.      Mich. Comp. Laws Ann. § 445.72(1), *et seq.*;

t.      Minn. Stat. Ann. § 325E.61(1)(a), *et seq.*;

u.      Mont. Code Ann. § 30-14-1704(1), *et seq.*;

v.      Neb. Rev. Stat. Ann. § 87-803(1), *et seq.*;

w.      Nev. Rev. Stat. Ann. § 603A.220(1), *et seq.*;

x.      N.H. Rev. Stat. Ann. § 359-C:20(1)(a), *et seq.*;

y.      N.J. Stat. Ann. § 56:8-163(a), *et seq.*;

z.      N.C. Gen. Stat. Ann. § 75-65(a), *et seq.*;

aa.     N.D. Cent. Code Ann. § 51-30-02, *et seq.*;

bb.     Okla. Stat. Ann. Tit. 24 § 163(A), *et seq.*;

cc.     Or. Rev. Stat. Ann. § 646A.604(1), *et seq.*;

dd.     R.I. Gen. Laws Ann. § 11-49.3-4(a)(1), *et seq.*;

ee.     S.C. Code Ann. § 39-1-90(A), *et seq.*;

ff.     Tenn. Code Ann. § 47-18-2107(b), *et seq.*;

gg.     Tex. Bus. & Com. Code Ann. § 521.053(b), *et seq.*;

hh.     Utah Code Ann. § 13-44-202(1), *et seq.*;

ii.     Va. Code Ann. § 18.2-186.6(B), *et seq.*;

jj.     Wash. Rev. Code Ann. § 19.255.010(1), *et seq.*;

kk.     Wis. Stat. Ann. § 134.98(2), *et seq.*; and

ll.     Wyo. Stat. Ann. § 40-12-502(a), *et seq.*

143.    As a result of Defendants' failure to reasonably safeguard Plaintiffs' and Class members' Personal and Medical Information, and the failure to provide reasonable and timely notice of the Data Breach to Plaintiffs and Class members, Plaintiffs and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their Personal and Medical Information, and are entitled to damages in an amount to be proven at trial. To the extent that pre-suit notification is required to assert a claim for damages, such claims are not asserted at this time but such notice has been given.

## COUNT VI – Violation of State Consumer Protection Statutes
### (On behalf of Plaintiffs and the Class)

144.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

145.    This count is brought on behalf of all Class members.

146.    Each Defendant is a "person" as defined in the relevant state consumer statutes.

147.    Defendants engaged in the conduct alleged herein that was intended to result, and which did result, in the trade and commerce with Plaintiffs and Class members. Defendants are engaged in, and their acts and omissions affect, trade and commerce. Further, Defendants' conduct implicates consumer protection concerns generally.

148.    Defendants' acts, practices and omissions were done in the course of Defendants' business of marketing, facilitating, offering for sale, and selling goods and services throughout the United States.

149.    Defendants' unlawful, unfair, deceptive, fraudulent and/or unconscionable acts and practices include:

a.      Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class members' Personal and Medical Information, which was a direct and proximate cause of the Data Breach;

b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents in the industry, which was a direct and proximate cause of the Data Breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' Personal and Medical Information, including but not limited to duties imposed by HIPAA, the FTC Act and similar state laws, rules, and regulations, which was a direct and proximate cause of the Data Breach;

d.    Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Class members' Personal and Medical Information, including by implementing and maintaining reasonable security measures or omitting material facts to the contrary;

e.    Misrepresenting that they would comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiffs' and the Class members' Personal and Medical Information or omitting material facts to the contrary;

f.    Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiffs' and Class members' Personal and Medical Information;

g.    Omitting, suppressing, and concealing the material fact that they did not comply with common law, statutory, and self-imposed duties pertaining to the security and privacy of Plaintiffs' and Class members' Personal and Medical Information; and

h.    Failing to promptly and adequately notify Plaintiffs and Class members that their Personal and Medical Information was accessed by unauthorized persons in the Data Breach.

150.    By engaging in such conduct and omissions of material facts, Defendants have violated state consumer laws prohibiting representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," representing that "goods and services are of a particular standard, quality or grade, if they are of another", and/or "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding"; as well as state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices.

151.    Defendants' representations and omissions of fact were material because they were likely to deceive reasonable persons about the adequacy of Defendants' data security and ability to protect the confidentiality of Personal and Medical Information.

152.    Defendants misled Plaintiffs and Class members and induced them to rely on their misrepresentations and omissions of material facts.

153.    Had Defendants disclosed that their data systems were not secure and, thus, vulnerable to attack, they would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled Plaintiffs' and Class members' Personal and Medical Information without advising that Defendants' data security practices were insufficient to maintain the safety and confidentiality of their Personal and Medical Information. Accordingly, Plaintiffs and the Class members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could reasonably not have discovered.

154.    Past breaches within the industry put Defendants on notice that their security and privacy protections were inadequate.

155.    Defendants' practices were also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected in laws like the MSBL, the MCPA, HIPAA and the FTC Act.

156.    The harm these practices caused to Plaintiffs and Class members outweighed their utility, if any.

157.    The damages, ascertainable losses and injuries, including to their money or property, suffered by Plaintiffs and Class members as a direct result of Defendants' unfair methods

of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices

as set forth herein include, without limitation:

      a.     The loss of and impact on Plaintiffs' and Class members' privacy;

      b.     theft of their Personal and Medical Information;

      c.     costs associated with the detection and prevention of identity theft and unauthorized use of their accounts;

      d.     the financial and temporal cost of monitoring their credit reports and financial accounts and setting up or turning on fraud alerts;

      e.     costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate and mitigate the actual and future consequences of the Data Breach, including without limitation finding fraudulent charges, purchasing credit monitoring and identity theft protection, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

      f.     the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal and Medical Information being placed in the hands of criminals;

      g.     damages to and diminution in value of their personal information entrusted to Defendants and with the understanding that Defendants would safeguard their data against theft and not allow access and misuse of their data by others; and

      h.     the continued risk to their Personal and Medical Information, which remains in the possession of Defendants and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect data in its possession.

158.    Defendants' conduct described herein, including without limitation, Defendants'

failure to maintain adequate computer systems and data security practices to safeguard Plaintiffs'

and Class members' Personal and Medical Information, Defendants' failure to disclose the

material fact that they did not have adequate computer systems and safeguards to adequately

protect Plaintiffs' and Class members' Personal and Medical Information, Defendants' failure to

provide timely and accurate notice to of the material fact of the Data Breach, and Defendants'

continued acceptance of Plaintiffs' and Class members' Personal and Medical Information despite their awareness of the inadequacies of their systems to protect such information from unauthorized access constitutes unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices in violation of the following state consumer statutes:

a.    The Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5(5), (7) and (27), *et seq.*;

b.    The Arizona Consumer Fraud Act, A.R.S. § 44-1522;

c.    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2), *et seq.*;

d.    The California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and the California Unfair Competition Law, Cal. Bus. and Prof. Code, § 17200, *et seq.*;

e.    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), *et seq.*;

f.    The Delaware Deceptive Trade Practices Act, Del. Code Ann. Title 6, § 2532(5) and (7), *et seq.*, and the Delaware Consumer Fraud Act, Del. Code Ann. Title 6 § 2513, *et seq.*;

g.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), *et seq.*;

h.    The Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-393(a) and (b)(2), (5) and (7), *et seq.*;

i.    The Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A-3(a)(5), (7) and (12), *et seq.*; and the Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. § 480-2(a), *et seq.*;

j.    The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), *et seq.*; and Idaho Code § 48-603C, *et seq.*;

k.    The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2, *et seq.*;

l.    The Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and (b)(1) and (2), *et seq.*;

m.    The Iowa Consumer Fraud Act, I.C.A. §§ 714H.3 and 714H.5, *et seq.*;

n.  The Kansas Consumer Protection Act, Kan. Stat. §§ 50-626(a) and (b)(1)(A)(D) and (b)(3), *et seq.*;

o.  The Kentucky Consumer Protection Act, K.R.S. § 367.170(1) and (2), *et seq.*;

p.  The Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1405(A), *et seq.*;

q.  The Maine Uniform Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1212(1)(E) and (G), *et seq.*, and the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207, *et seq.*;

r.  The Maryland Consumer Protection Act, Md. Code Commercial Law, § 13-301(1) and (2)(i), and (iv) and (9)(i), *et seq.*;

s.  The Michigan Consumer Protection Act, M.C.P.L.A. § 445.903(1)(c)(e),(s) and (cc), *et seq.*;

t.  The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), et seq., the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd. 3(a);

u.  The Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-5(1), (2)(e) and (g), *et seq.*;

v.  The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), *et seq.*;

w.  The Montana Unfair Trade Practices and Consumer Protection Act, MCA §§ 30-14-103, *et seq.*;

x.  The Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302(a)(5) and (7), *et seq.*;

y.  The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7), *et seq.*;

z.  The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2(v) and (vii), *et seq.*;

aa.  The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, *et seq.*;

bb.  The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7) and (14) and 57-12-3, *et seq.*;

cc.  New York Business Law, N.Y. Gen. Bus. Law § 349(a);

dd.    The North Carolina Unfair Trade Practices Act N.C.G.S.A. § 75-1.1(a), *et seq.*;

ee.    The North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02, *et seq.*;

ff.    The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A) and (B)(1) and (2), *et seq.*;

gg.    The Oklahoma Consumer Protection Act, 15 Okl. Stat. Ann. § 753(5), (7) and (20), *et seq.*; and the Oklahoma Deceptive Trade Practices Act, 78 Okl. Stat. Ann. § 53(A)(5) and (7), *et seq.*;

hh.    The Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.608(1)(e)(g) and (u), *et seq.*;

ii.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v)(vii) and (xxi), and 201-3, *et seq.*;

jj.    The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1(6)(v), (vii), (xii), (xiii) and (xiv), *et seq.*;

kk.    The South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20(a), *et seq.*;

ll.    The South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1), *et seq.*;

mm.    The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104(a) and (b)(5) and (7);

nn.    The Texas Deceptive Trade Practices- Consumer Protection Act, V.T.C.A., Bus. & C. § 17.46(a), (b)(5) and (7), *et seq.*;

oo.    The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1) and (2)(a) and (b);

pp.    The Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a), *et seq.*;

qq.    The Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A)(5)(6) and (14), *et seq.*;

rr.    The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, *et seq.*;

ss.    The West Virginia Consumer Credit and Protection Act, W.V.A. Code § 46A-6-104, *et seq.*;

tt.    The Wisconsin Deceptive Trade Practices Act, W.S.A. § 100.20(1), *et seq.*; and

uu.    The Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i), (iii) and (xv), *et seq.*

159.    Plaintiffs have sent Defendants a pre-suit demand letter pursuant to Massachusetts General Laws, Chapter 93A, § 9 and other applicable state laws, and will amend this complaint to add a claim for violation of Chapter 93A if this claim is not resolved in response to Plaintiffs' demand.

160.    Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief, including an injunction barring Defendants from disclosing their PII and PHI without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper. To the extent that pre-suit notification is required to assert a claim for damages under some or all of these state laws, such claims are not asserted at this time but such notice has been given as set forth above.

## COUNT VII –- Intrusion Upon Seclusion
### (By Plaintiffs on behalf of the Class, or, in the alternative, the Massachusetts Subclass)

161.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

162.    This count is brought on behalf of all Class members.

163.    Plaintiffs and Class members had a reasonable expectation of privacy in the Personal and Medical Information that Defendants possessed and/or continue to possess.

164.    By failing to keep Plaintiffs' and Class members' Personal and Medical Information safe, and by misusing and/or disclosing their Personal and Medical Information to unauthorized parties for unauthorized use, Defendants invaded Plaintiffs' and Class members' privacy by:

a.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

      b.    Publicizing or permitting the publication of private facts about Plaintiffs and Class members, which is highly offensive to a reasonable person.

165.    Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' and Class members' position would consider Defendants' actions highly offensive.

166.    Defendants invaded Plaintiffs' and Class members' right to privacy and intruded into Plaintiffs' and Class members' private affairs by misusing and/or disclosing or permitting the disclosure of their private information without their informed, voluntary, affirmative, and clear consent.

167.    As a proximate result of such misuse and disclosures, Plaintiffs' and Class members' reasonable expectation of privacy in their Personal and Medical Information was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiffs' and Class members' protected privacy interests.

168.    In failing to protect Plaintiffs' and Class members' Personal and Medical Information, and in misusing and/or disclosing or permitting the disclosure of their Personal and Medical Information, Defendants have acted with malice and oppression and in conscious disregard of Plaintiffs' and the Class members rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing their own economic, corporate, and legal interests above the privacy interests of over 2.5 million enrollees. Plaintiffs, therefore, seek an award of damages, including punitive damages, on behalf of Plaintiffs and the Class.

**COUNT VIII –- Unjust Enrichment**
**(By Plaintiffs on behalf of the Class, or, in the alternative, the Massachusetts Subclass)**

169.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

170.    This count is brought on behalf of all Class members.

171.    Plaintiffs and the Class have an interest, both equitable and legal, in their Personal and Medical Information that was collected and maintained by Defendants.

172.    Defendants were benefitted by the conferral upon them of Plaintiffs' and Class members' Personal and Medical Information and by their ability to retain and use that information. Defendants understood that it was in fact so benefitted.

173.    Defendants also understood and appreciated that Plaintiffs' and Class members' Personal and Medical Information was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that information.

174.    But for Defendants' willingness and commitment to maintain the privacy and confidentiality of this Personal and Medical Information, Plaintiffs and Class members would not have provided or authorized their Personal and Medical Information to be provided to Defendants, and Defendants would have been deprived of the competitive and economic advantages they enjoyed by falsely claiming that their data-security safeguards met reasonable standards or omitting material facts to the contrary. These competitive and economic advantages include, without limitation, wrongfully gaining enrollees, gaining the reputational advantages conferred upon them by Plaintiffs and Class members, and monetary savings resulting from failure to reasonably upgrade and maintain data technology infrastructures,, and realizing excessive profits as a result thereof.

175.    As a result of Defendants' wrongful conduct as alleged herein (including, among other things, their deception of Plaintiffs, members of the Class, and the public relating to the nature and scope of the Data Breach; their failure to employ adequate data security measures; their continued maintenance and use of the Personal and Medical Information belonging to Plaintiffs and Class members without having adequate data security measures; and other conduct facilitating the theft of that Personal and Medical Information as referenced above) Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the Class.

176.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class members' sensitive Personal and Medical Information, while at the same time failing to maintain that information secure from intrusion.

177.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from Plaintiffs and the Class in an unfair and unconscionable manner. Defendants' retention of such benefits under circumstances make it inequitable to do so, and thus constitutes unjust enrichment.

178.    The benefit conferred upon, received, and enjoyed by Defendants was not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendants to retain the benefit.

179.    Defendants are therefore liable to Plaintiffs and the Class for restitution in the amount of the benefit conferred on Defendants as a result of their wrongful conduct, including specifically the value to Defendants of the Personal and Medical Information that was accessed and exfiltrated in the Data Breach and the profits Defendants received from the monies they saved from their failure to reasonably upgrade and maintain their data technology infrastructures.

### COUNT IX –- Declaratory Judgment
**(By Plaintiffs on behalf of the Class, or, in the alternative, the Massachusetts Subclass)**

180.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

181.    This count is brought on behalf of all Class members.

182.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described herein.

183.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiffs' and Class members' Personal and Medical Information, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class members from further data breaches that compromise their Personal and Medical Information. Defendants have admitted that their data security measures remain inadequate as many key systems remain offline.

184.    Plaintiffs and the Class continue to suffer injury as a result of the compromise of their Personal and Medical Information and remain at imminent risk that further compromises of their Personal and Medical Information will occur in the future.

185.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendants continue to owe a legal duty to secure Plaintiffs' and Class members' Personal and Medical Information, and to timely notify them of any data breach.

186.    The Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to establish and implement data security measures that are adequate to secure and protect Plaintiffs' and Class members' Personal and Medical Information in Defendants' possession.

187.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy. The threat of another breach of the Personal and Medical Information in Defendants' possession, custody, and control is real, immediate, and substantial. If another breach of Defendants' network, systems, servers, or workstations occurs, Plaintiffs and

the Class will not have an adequate remedy at law, because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

188.    The hardship to Plaintiffs and the Class if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiffs and the Class will potentially be subjected to substantial identify theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants has a pre-existing legal obligation to employ such measures in any event.

189.    Issuance of the requested injunction will serve the public interest by minimizing or preventing another data breach by Defendants, thus eliminating additional injuries to Plaintiffs and the thousands of Class members whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Counsel as Class Counsel;

B.    That Plaintiffs be granted the declaratory relief sought herein;

C.    That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices as described herein;

D.    That the Court award Plaintiffs and the Class members compensatory, consequential, and general damages in an amount to be determined at trial as applicable to the above counts;

E.    That the Court award Plaintiffs and the Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law under the above counts;

F.    That the Court award Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses to their counsel;

G.    That the Court award pre- and post-judgment interest at the maximum legal rate;

H.    That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

I.    That the Court grant all other relief as it deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

Date: June 21, 2023                         Respectfully Submitted,

*/s/ Patrick J. Sheehan*
Patrick J. Sheehan
(BBO# 639320)
**WHATLEY KALLAS, LLP**
101 Federal Street, 19th Floor
Boston, Massachusetts 02110
Telephone: (617) 203-8459
Facsimile: (800) 922-4851
psheehan@whatleykallas.com

Alan M. Mansfield[*]
**WHATLEY KALLAS, LLP**
16870 W. Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: (619) 308-5034
Facsimile: (855) 274-1888
Email: amansfield@whatleykallas.com

Deborah J. Winegard[*]
**WHATLEY KALLAS, LLP**
1068 Virginia Avenue NE
Atlanta, GA 30306
Telephone: (404) 607-8222
Facsimile: (800) 922-4851
Email: dwinegard@whatleykallas.com

[*]*Pro Hac Vice* Application to be filed

*Attorneys for Plaintiffs and the Class*